**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

| | |
|---|---|
| **KEVIN HYATT,** | |
| *Plaintiff*, | **CIVIL ACTION FILE NO.** |
| **v.** | |
| **BRIAN JARRETT DBA BRIAN JARRETT STATE FARM, and BRIAN JARRETT,** | **JURY DEMAND** |
| *Defendants.* | |

## COMPLAINT

**NOW COMES** Kevin Hyatt (hereinafter "Plaintiff") and asserts this Complaint against Defendants Brian Jarrett DBA Brian Jarrett State Farm (hereinafter "Defendant BJSF") and Brian Jarrett (hereinafter "Defendant Jarrett") (hereinafter collectively "Defendants") for violations of the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq.* ("FLSA" or "the Act") and for violations of Georgia state law. Plaintiff states more fully as follows:

## INTRODUCTION

1.     Plaintiff worked for Defendants within three (3) years preceding the filing of this Complaint (hereinafter "the Actionable Period"). Defendants misclassified the Plaintiff as salaried, exempt, and, additionally, failed and willfully refused to pay the Plaintiff his overtime wages equal to one and one-half times his "regular rate" as required by the FLSA, 29 U.S.C. §207. Additionally, Defendants failed to pay

Plaintiff pursuant to a bonuses provision in his contract with Defendant BSJF. Plaintiff seeks his unpaid overtime wages for three (3) years preceding the filing of this Complaint, liquidated damages thereon, his attorneys' fees and costs of litigation under the FLSA, and additionally his bonuses and commissions due to a breach of contract (or, alternatively) promissory estoppel or, along with Plaintiff's attorney's fees and costs of litigation under O.C.G.A. §13-6-11.

## JURISDICTION

2.      Plaintiff brings this action under the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq*., and for pendant state law claims. This Court has original jurisdiction pursuant to 29 U.S.C. §216(b), and 28 U.S.C. §1331, §1132(a)(1)(B), and §1337. The Court has supplemental jurisdiction over Plaintiff's Georgia state law claims pursuant to 28 U.S.C. §1367.

## VENUE

3.      Defendant BSJF, is a Georgia entity with its office located at 47 Greensboro Highway, Watkinsville, Oconee County, Georgia 30677-2515. Defendant BSJF may be served via Brian Jarrett at the same address. Defendant Jarrett works and resides in the Middle District of Georgia. Venue for this action properly lies in the Middle District of Georgia, Athens Division, pursuant to 28 U.S.C. §1391(b) and §1391(c)(2), and Local Rules 3.1, and 3.4, M.D. Ga, as the acts and commissions

giving rise to this action occurred in the Middle District of Georgia and the action

is not founded solely on diversity of citizenship.

## DEFENDANTS' COVERAGE UNDER THE FLSA
### Sub-Part 1: Defendant BJSF

4.    Defendant BSJF operates a business offering insurance to the public on

behalf of State Farm in the Athens, Georgia area.

5.    Defendant BSJF buys supplies and equipment, including computers, out of

the stream of interstate commerce.

6.    Defendant BSJF utilizes interstate credit/debit card processing in the course

of its business.

7.    Defendant BSJF utilizes the interstate banking system in the course of its

business.

8.    Customers of Defendant BSJF, place orders for insurance via Defendant

BSJF s web site, found at https://www.doublecheckwithbrian.com.

9.    Defendant BSJF and each of its employees, including office staff, insurance

agents, and others operate within the stream of interstate commerce.

10.    In calendar year 2021, Defendant BSJF, had an annual gross volume of sales

made or business done of not less than five hundred thousand dollars ($500,000),

exclusive of excise taxes at the retail level, as defined in §3(s)(1) of the Act. 29

U.S.C. §203(s)(1).

11.     For calendar year 2022, Defendant BSJF, had an annual gross volume of sales made or business done of not less than five hundred thousand dollars ($500,000), exclusive of excise taxes at the retail level, as defined in §3(s)(1) of the Act. 29 U.S.C. §203(s)(1).

12.     In calendar year 2023, Defendant BSJF, has an annual gross volume of sales made or business done of not less than five hundred thousand dollars ($500,000), exclusive of excise taxes at the retail level, as defined in §3(s)(1) of the Act. 29 U.S.C. §203(s)(1).

13.     Defendant BSJF, constitutes an enterprise engaged in commerce or in the production of goods or services for commerce within the meaning of §3(r), §3(s)(1), §6(a) and §7(a) of the Act, 29 U.S.C. §203(r), §203(s)(1), §206(a) and §207(a), for the years 2021 through 2023.

14.     For the calendar year 2021, Defendant BSJF, was covered by, and subject to, the requirements of the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq.*

15.     For the calendar year 2022, Defendant BSJF, is covered by, and subject to, the requirements of the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq.*

16.     For the calendar year 2023, Defendant BSJF, is covered by, and subject to, the requirements of the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq.*

17. Defendant BSJF, is an "employer" in an industry affecting commerce within the meaning of §3(d) of the Act, 29. U.S.C. §203(d).

18. Defendant BSJF, was an "employer" of Plaintiff as defined in §3(d) of the Act. 29 U.S.C. §203(d), in 2021.

19. Defendant BSJF, was an "employer" of Plaintiff as defined in §3(d) of the Act. 29 U.S.C. §203(d), in 2022.

20. Defendant BSJF, was an "employer" of Plaintiff as defined in §3(d) of the Act. 29 U.S.C. §203(d), in 2023.

21. During the relevant time period – June 2021 through January 2023 – Defendant BSJF, constituted an enterprise engaged in commerce or in the production of goods or services for commerce within the meaning of §3(r), §3(s)(1), §6(a) and §7(a) of the Act. 29 U.S.C. §203(r), §203(s)(1), §206(a) and §207(a).

### Sub-Part 2: Defendant Jarrett as "Employer" under the FLSA

22. Defendant Jarrett is an owner and/or has an interest in Defendant BSJF.

23. Defendant Jarrett, along with other individuals, manages the day-to-day operations of Defendant BSJF.

24. Defendant Jarrett hired Plaintiff.

25. Defendant Jarrett authorized the agreement between Defendant BSJF, Defendant Jarrett, and Plaintiff.

26.     Defendant Jarrett determined the terms and conditions of Plaintiff's employment, including his rate of pay, form of payment, his job duties and his classification as an employee.

27.     Defendant Jarrett acted directly in the interest of Defendant BSJF, in relation to Defendant BSJF's employees such as Plaintiff. Thus, Defendant Jarrett was an "employer" of the Plaintiff within the meaning of §3(d) of the FLSA, 29 U.S.C. §203(d).

## FLSA RELATED FACTS

28.     Plaintiff was employed by Defendants from approximately June 26, 2021, through on or about January 20, 2023 (hereinafter the "Employment Period.")

29.     During the Employment Period, Plaintiff was employed by the Defendants as an insurance agent producer with additional office cleaning duties.

30. During the Employment Period, Plaintiff's duties as an insurance agent producer included developing relationships with prospective clients supplied by the Defendants (amongst other leads), continuing relationships with clients supplied by the Defendants, and to sell and process insurance policies on behalf of Defendants.

31.     Plaintiff worked at the Defendants' physical address and did not travel outside of the office to sell or process insurance policies.

32.     Plaintiff also had other office duties, such as, but not limited to, retrieving the mail and cleaning the office regularly on Thursdays and Fridays in the Employment period.

33.      Defendant informed Plaintiff he was not an insurance agent or insurance broker during the Employment Period.

34.     Effective January 1, 2020, employers must pay employees a salary of at least $684 per week, as part of the Department of Labor's "salary-level" test.

35.     Effective January 1, 2020, employers can satisfy the salary level test through nondiscretionary bonuses, commissions, and other incentives of up to ten percent (10%) of the standard salary level, including through the use of a final "catch-up" payment made within one (1) pay period after the of the 52-week year.

36.     During the Employment Period, Plaintiff was paid a base salary of $24,000.00 annually, or approximately $461.54 per 52 week work week, plus commissions and non-discretionary bonuses.

37.     For each work week in 2021, Plaintiff was paid a pro-rated annual salary of $24,000, or approximately $461.54 per 52 week work week, plus commissions, and non-discretionary bonuses.

38.     Plaintiff was not paid a "catch-up" payment within one (1) pay period after 2021.

39.     For each work week in 2022, Plaintiff was paid an annual salary of $24,000, or approximately $461.54 per 52 week work week, plus commissions, and non-discretionary bonuses.

40.     Plaintiff was not paid a "catch-up" payment within one (1) pay period after 2022.

41.     For each work week in 2023, Plaintiff was paid a pro-rated annual salary of $24,000, or approximately $461.54 per 52 week work week.

42.     Plaintiff was not paid a "catch-up" payment within one (1) pay period after his termination on or about January 20, 2023.

43.     Defendants did not pay Plaintiff for any hours worked in excess of 40 hours per week during his Employment Period.

44.     Defendants paid Plaintiff a salary for his work and failed to pay Plaintiff 1.5 times his hourly wage for any hours worked over forty hours in a work week for the period Employment Period.

45.     During the Employment Period, Plaintiff regularly and consistently began work at approximately 8:20 AM and worked until approximately at least 6:00 PM each work day. Plaintiff ate lunch at his desk while working. During the Employment Period, Plaintiff regularly stayed at work after 6:00 PM, for an average of 2.0 hours a week worked *after* 6:00 PM each work week for the

Employment Period. Accordingly, Plaintiff worked an average of 50.2 hours each work week during the Employment Period.

46. During the Employment Period, Plaintiff's work duties included, but was not limited to the following:

(a) contacting existing clients regarding their queries;

(b) contacting prospective clients regarding their queries in to insurance products;

(c) discussing potential insurance policies with clients within the guidelines set by State Farm and Defendants' stated requirements;

(d) manually completing insurance policies with clients within the guidelines set by State Farm and Defendants' stated requirements;

(e) process payments from clients for their insurance policies;

(f) provide changes to clients' insurance policies;

(e) cleaning the office bathroom on a set schedule;

(f) vacuuming the office on a set schedule; and,

(g) general office maintenance.

47. Plaintiff was not an exempt employee under FLSA §13(a)(1), 29 U.S.C. §213(a)(1).

48.     Plaintiff's work as an insurance agent producer occurred in the Defendants'
office in Watkinsville, Georgia. Plaintiff did **not** travel outside of the office to
other locations for the purpose of selling insurance outside the office.

## DEFENDANTS' ACTIONS WERE "WILLFULL"

49.     Defendants either knew, or acted with reckless indifference, that their failure
to pay overtime wages and/or misclassification of Plaintiff as an inside sales exempt
salesman violated FLSA.

50.     On information and belief, Defendants never sought any professional advice
regarding their legal obligations under the FLSA.

51.     On information and belief, Defendants never sought any professional advice
regarding the proper classification of workers as employees or independent
contractors under the FLSA.

## PLAINTIFF'S STATE LAW CLAIMS FACTS
### Sub-Part A: Fraud Facts

52.     Plaintiff worked for the Defendants as an insurance agent producer during
his Employment Period.

53.     Defendants authorized and/or set the policies and procedures regarding the
writing of insurance policies on behalf of State Farm and its affiliated insurance
companies, such as Gainsco.

54.     Plaintiff followed the Defendants' practices and procedures for the writing and/or modification of insurance policies, including the practice of confirming questions regarding policies prior to binding them.

55.     Defendants' policy is to accept the statements made by any current or potential customers' factual statements at face value.

56.     In or about October 2021, Plaintiff wrote an auto insurance policy, through Gainsco, for a family which included Tammy H., the mother, and Zachary H., the son, which conformed to Defendants' practices and procedures.

57.      In or about October 2021, Tammy H. and Zachary H. lived together and were insured on the same insurance policy.

58.      In or about April 2022, Plaintiff wrote an auto insurance policy for policy holder Kandice H, Zachary H.'s fiancé or spouse.

59.      In or about July 2022, Defendant Jarrett also wrote an insurance policy for Tammy H.  and Zachary H.

60.      Subsequently, Kandice H. agreed to insure Zachary H. through Kandice H.'s insurance policy in or about July 2022.

61.     Plaintiff requested, and Kandice H. agreed to and signed, an authorization form allowing Zachary H. to be insured through Kandice H.'s policy; this request, review, and confirmation through the authorization form comported with Defendants' practices and procedures.

62.    In or about October 2022, Tammy H. contacted Plaintiff, informed the Plaintiff that she resided with her son, Zachary H., and requested that she have an auto insurance policy written through Zachary H. and Kandice H.'s account, which Kandice H. confirmed in writing as acceptable.

63.    Tammy H. also requested, and received, a renter's insurance policy for her belongings kept at a second location.

64.    Plaintiff contacted Defendants and confirmed with the Defendants that the policy requests by Tammy H. followed Defendants' practices and procedures.

65.    After confirming Tammy H.'s request with the Defendants, Plaintiff wrote Tammy H. an auto insurance and renter's insurance policy based on the information provided by Tammy H. and affirmed as acceptable by the Defendants.

66.    Approximately one month after insuring Tammy H. on Kandice H.'s policy, Tammy H. made a claim on the policy which Kandice H. allegedly later claimed was improper.

67.    Sometime in or about December 2022, the insurer State Farm requested clarification regarding the insurance policies written for Tammy H, Zachary H. and Kandice H. by the Plaintiff in the form of a written report to State Farm describing the details of the transaction (hereinafter "the Write-Up.")

68. Defendants informed Plaintiff of State Farm's request for the Write-Up and asked Plaintiff to write a simple written account of the transaction for the Write-Up.

69. Defendants also knowingly requested that Plaintiff **omit** certain critical information necessary for the Write-Up, such as, but not limited to, that Plaintiff had received verbal confirmation that the proposed insurance policy was acceptable from Defendants, that Tammy H.'s policy requests conformed with industry practices, and that Kandice H. had authorized in writing that the policy addition was acceptable with the intention that Plaintiff complied with the Defendants' request in a manner that would knowingly produce a false impression on State Farm and with Plaintiff's own understanding of the facts in the matter.

70. Upon information and belief, Defendants also knowingly edited and revised Plaintiff's Write-Up prior to providing it to State Farm in a manner so as to minimize and/or hide their culpability in the authorization of the policies on behalf of Tammy H. for the purpose of deceiving Plaintiff and State Farm

71. In or about January 2023, on information and belief, Defendants submitted the edited Write-Up to State Farm and Plaintiff relied on Defendants' report to be an accurate and true representation of the facts in the transaction.

72. In or about January 2023, Defendants communicated with State Farm and knowingly provided false information regarding Plaintiff's work on behalf of

Defendants, which resulted in State Farm ending its business relationship with Plaintiff due to Defendants' false statements. Furthermore, on information and belief, Defendants' withdrew Plaintiff's appeal to State Farm regarding his alleged bad faith transaction with Katherine. H. and Tammie H.

73.     In or about January 17, 2023, Defendant stated that Plaintiff was the most important member on the team and that Plaintiff should ignore any warnings from State Farm and was not in trouble with State Farm.

74.     In or about January 20, 2023, Defendants terminated Plaintiff for his alleged failure to comply with State Farm's policies and procedures.

75.     In or about January 2023, Plaintiff learned that State Farm would no longer allow Plaintiff to write **any** policies on its behalf, effectively denying Plaintiff the ability to work on behalf of State Farm as an insurance policy writer.

### Sub-Part B: Tortious Interference Set of Facts

76.     In or about January 2023, Plaintiff met with another insurance broker, Jacob Fincher, the owner of another State Farm based insurance agency, Jacob Fincher State Farm.

77.     In or about January 2023, the Jacob Fincher State Farm hired Plaintiff to act as an insurance agent producer, in which Plaintiff had similar duties as his previous employment with Defendants selling insurance policies on behalf of State Farm in

Georgia, at an annual salary of approximately $37,500.00, plus bonus and commissions based upon sales

78.    In or about January 2023, the Jacob Fincher State Farm approved an account, known as an "alias", which allowed Plaintiff to access State Farm's online insurance portal to enter data for insurance policies for the purpose of work on behalf of Jacob Fincher State Farm.

79.    In or about January 2023, the Plaintiff and Jacob Fincher State Farm signed an "LSA" agreement, which allowed Plaintiff to access State Farm's online insurance portal for purpose of work with Jacob Fincher State Farm.

80.    At or about the time of Plaintiff's hiring by the Jacob Fincher State Farm, Defendants contacted Jacob Fincher State Farm and, on information and belief, described Defendants' termination of Plaintiff as due to Plaintiff's allegedly and knowingly false bad faith actions while also withholding information regarding the Defendant's approval of Plaintiff's valid and policy adherent actions, and withdrew Plaintiff's statements and appeal to State Farm regarding entries in the policies sold to Kandice H. and Tammy H..

81.    Sometime in late January 2023, State Farm terminated the Plaintiff's ability to access its system through an "alias" is permanently terminated for alleged "untrustworthy activities."

82.     Defendants were strangers to Plaintiff's relationship with Jacob Fincher State Farm.

83.     After the Defendants communication with Jacob Fincher State Farm, the Jacob Fincher State Farm terminated Plaintiff's employment.


## Sub-Part C: 2nd  Tortious Interference Set of Facts

84.     In or about October 2022, Plaintiff initiated a business plan with State Farm to become Plaintiff's own State Farm insurance agent through their Agent Aspirant Program, thereby also selling insurance policies on behalf of State Farm in the Athens, Georgia area.

85.     Defendants were strangers to the relationship between Plaintiff and State Farm.

86.     In or about January 2023, Plaintiff continued to apply to acquire Plaintiff's own State Farm insurance agent status and needed to complete the Securities Industry Essentials (hereinafter "SIE") application process, a final step in acquiring Plaintiff's own State Farm insurance agent.

87.     Plaintiff was in the process of completing the SIE in or about January 2023.

88.     In or about January 2023, Defendants contacted State Farm and both withdrew Defendants' appeal of State Farm's suspension of Plaintiff's ability to write State Farm based insurance policies and also maliciously and erroneously

communicated to State Farm that Plaintiff had written the policy for Candace H. and Tammy H. in bad faith.

89.     As a result of Defendants statements to State Farm and withdrawal of Plaintiff's appeal, State Farm dismissed Plaintiff's application to become a State Farm insurance agent or participate in the Agent Aspirant Program.

90.     Upon completion of the application to become a State Farm Insurance agent, Plaintiff would have been awarded a book of business with State Farm valued at approximately $2,400,000.00, to which Plaintiff would have been entitled to at least ten percent (10%) and up to twelve percent (12%) of the value of the book of insurance as an insurance agent for State Farm.

91.     As a result of Defendants' actions, Plaintiff can no longer write policies for State Farm or become a State Farm insurance agent.

92.     Furthermore, Jacob Fincher State Farm orally agreed to provide Plaintiff with up to $20,000.00 if Plaintiff became an insurance agent through State Farm. As a result of Defendants actions, Plaintiff could no longer receive this bonus through Jacob Fincher State Farm.

93.     Furthermore. Defendants had promised to provide Plaintiff with up to $5,000.00 if Plaintiff became an insurance agent for State Farm. As a result of Defendants' actions, Plaintiff could no longer receive this bonus through Defendants.

## Sub-Part D: Misc. State Law Claim Facts

94.     In or about December 2021, Defendants offered a sales incentive, or bonus, in the form of an all-expenses paid three (3) day cruise to the Bahamas (hereinafter "Bahaman Cruise") which included round trip airfare and with an additional $500.00 in spending money for any employee, and their guest, who sold enough insurance policies to qualify as a "level 3 salesman" in 2022.

95.     Plaintiff sold sufficient policies to qualify as a level 3 salesman and believed he would receive the benefit of his extra efforts in selling insurance policies.

96.     Defendants orally confirmed that Plaintiff qualified for the promotion as a "level 3 salesman" and therefore qualified for the Bahaman Cruise

97.     Defendants refused to provide Plaintiff with the $500.00 and the 3 day Bahaman Cruise for him and a guest of his choosing, despite Plaintiff meeting the terms of the agreement.

98.     In or about December 2021, Defendants informed Plaintiff of a sales incentive for 2022; specifically, any employee who sold over 120 auto insurance policies in 2022 would receive a steak dinner for the employee and one guest at the Georgia Club.

99.     As a result of Defendants' proposed 2022 sales incentive, Plaintiff worked diligently and sold approximately 700 new auto insurance policies, making Plaintiff the highest auto insurance policy salesman for Defendants.

100. Defendants refused to provide Plaintiff with either the steak dinner and/or the value of the steak dinner at the Georgia Club.

101. The value of the steak dinner for Plaintiff and a guest at the Georgia Club is estimated at $500.00.

102. In or about January 2023, Defendants communicated to Plaintiff that he would not be "charged back" for any commissions on any policies written in December 2022 or January 2023, of which Plaintiff had written approximately 272 policies.

103. Defendant Jarrett again affirmed on or about January 20, 2023, that Defendants would pay the commissions to Plaintiff for policies written in December 2022 and January 2023.

104. Defendants have refused to pay Plaintiff for some of the commissions written in December 2022 and January 2023, but has refused to pay the total amount owed, estimated at $2,000.00.

105. Defendants agreed to offer a year end performance bonus of up to $5,000.00 for work performed in 2022 as a sales incentive.

106. In or about the Winter of 2022-23, Defendants agreed Plaintiff would receive a year end performance bonus of $2,000.00 based upon Plaintiff's work in 2022.

107.    Defendants have refused to pay Plaintiff the $2,000.00 performance bonus despite numerous requests for payment of the $2,000.00 performance bonus.

108.    In or about 2022, Defendants agreed to pay Plaintiff a $500.00 bonus each month Plaintiff sold an agreed upon over $100,000.00 in insurance premiums.

109.    In or about December 2022, Plaintiff sold more than $100,000.00 in insurance premiums and therefore qualified for the $500.00 bonus for sales performance for the month of December 2022.

110.    Defendants have failed to pay Plaintiff the December 2022 $500.00 sales bonus, despite Plaintiff having performed the necessary conditions to receive it.

111.    Defendants offered a sales bonus of a free lunch to Plaintiff for any work day in which Plaintiff sold more than ten (10) policies in one day.

112.    Plaintiff exceeded the sales bonus of a free lunch to Plaintiff for selling more than ten (10) policies in one day on approximately eight (8) days in late 2022.

113.    Defendants owe Plaintiff the value of eight (8) free lunches as a sales bonus which Plaintiff earned but has not been awarded.

114.    In or about December 2022, Defendants and Plaintiff agreed to a base salary increase from $24,000.00 to $30,000.00 annually, beginning in January 2023.

115.    Plaintiff performed the work on behalf of Defendants for the increased salary of $30,000.00 annually in 2023 and expected to be paid the additional salary.

116.   Plaintiff regularly requested that the agreed upon the annual salary increase to $30,000.00 be paid and Defendants refused to pay the annual salary increase to $30,000.00 to Plaintiff.

## COUNT I:  FAILURE TO PAY OVERTIME WAGES UNDER THE FLSA

117.   Plaintiff restates and realleges paragraphs one (1) through one-hundred-sixteen (116), *supra*.

118.   For all workweeks in the Employment Period in which Defendants employed Plaintiff, Defendants violated the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §207, by failing to pay Plaintiff one and one-half (1.5) times his "regular rate" of pay for all hours worked in excess of forty (40) hour per workweek.

119.   Defendants owe Plaintiff back wages for all unpaid overtime, in an amount to be determined at trial, pursuant to 29 U.S.C. §207 and §216.

120.   Additionally, Defendants owe Plaintiff liquidated damages in an equal amount for all unpaid overtime wages pursuant to 29 U.S.C. §207 and §216.

121.   Additionally, Defendants owe Plaintiff his reasonable attorneys' fees and costs associated with this Action pursuant to 29 U.S.C. §216.

## COUNT II:  BREACH OF CONTRACT UNDER GEORGIA LAW

122. Plaintiff restates and realleges paragraphs one (1) through one-hundred-sixteen (116), *supra*.

123. Defendants offered, and Plaintiff both accepted and performed the work for the following agreements:

(a) selling insurance policies sufficient to earn an all-expense paid, including a $500.00 cash prize, three day cruise to the Bahamas for Plaintiff and a guest;

(b) selling a sufficient level of insurance policies to earn a steak dinner for Plaintiff and a guest at the Georgia Club;

(c) selling a sufficient level of insurance policies in 2022 to earn a $2,000.00 bonus payment;

(d) selling a sufficient level of insurance policies in December 2022 to earn a $500.00 bonus payment;

(e) sold a sufficient level of insurance policies in the Fall of 2022 to earn eight (8) lunches paid for by Defendants;

(f) selling approximately 272 insurance policies in December 2022 and January 2023 for which Defendants have not paid Plaintiff the commission owed in an amount to be proven at trial; and,

(g) working for approximately 3 weeks at a salaried rate of $30,000.00 per

year for which Plaintiff only received the salaried rate of $24,000.00 per

year.

124.   To date, Defendants have failed and/or refused to pay Plaintiff per the

agreements stated above.

125.   Under the terms of their agreements, and pursuant to Georgia law,

Defendants, owe Plaintiff for the unpaid agreements in an amount to be proven at

trial.

## COUNT III:  (IN THE ALTERNATIVE) CLAIM FOR UNJUST ENRICHMENTUNDER GEORGIA LAW

126.   Plaintiff restates and realleges paragraphs one (1) through one-hundred-

sixteen (116), *supra*.

127. Defendants offered to pay and Plaintiff both performed the work and

expended considerable energy on behalf of Defendants during the Employment

Period with the expectation that the Plaintiff would be promptly paid for the work

and energy expended. Specifically, Plaintiff performed the following work/services

on behalf of the Defendants for which the Plaintiff expected to be paid:

(a) selling insurance policies sufficient to earn an all-expense paid, including

a $500.00 cash prize, three day cruise to the Bahamas for Plaintiff and a

guest;

(b) selling a sufficient level of insurance policies to earn an a steak dinner for Plaintiff and a guest at the Georgia Club;

(c) selling a sufficient level of insurance policies in 2022 to earn a $2,000.00 bonus payment;

(d) selling a sufficient level of insurance policies in December 2022 to earn a $500.00 bonus payment;

(e) sold a sufficient level of insurance policies in the Fall of 2022 to earn eight (8) lunches paid for by Defendants;

(f) selling approximately 272 insurance policies in December 2022 and January 2023 for which Defendants have not paid Plaintiff the commission owed; and,

(g) working for approximately 3 weeks at a salaried rate of $30,000.00 per year for which Plaintiff only received the salaried rate of $24,000.00 per year.112.

Defendants have never paid Plaintiff for these services / work performed on behalf of the Defendants despite his repeated demands.

128.   Defendants stated that Plaintiff would be paid for these services / work performed on behalf of the Defendants.

129.   Defendants happily utilized services / work of Plaintiff to complete the Defendants own work requirements.

130.   Defendants, pursuant to Georgia law, owe Plaintiff for the unpaid services /

work in an amount to be proven at trial.

### COUNT IV: TORTIOUS INTERFERENCE
### WITH CONTRACTUAL RELATIONS
### (FOR DAMAGES AND INJUNCTIVE RELIEF)

131.   Plaintiff restates and realleges paragraphs one (1) through one-hundred-
sixteen (116), *supra*.

132.   Plaintiff has a valid work agreement with Jacob Fincher and/or Jacob

Fincher State Farm.

133.   Defendants induced Jacob Fincher and/or Jacob Fincher State Farm to

terminate Plaintiff's work agreement with Jacob Fincher and/or Jacob Fincher

State Farm improperly and without privilege by making false statements regarding

Plaintiff's work history and alleged bad faith actions, amongst other allegations.

134.   Defendants' interference was improper in means and motive.

135.   As a result of Defendants' intentional interference with Plaintiff's

contractual agreement to work with Jacob Fincher and/or Jacob Fincher State

Farm, Plaintiff has suffered substantial and irreparable injury and is threatened

with further substantial injury due to Defendants' continued interference with

Plaintiff's contractual relationships with Jacob Fincher and/or Jacob Fincher State Farm.

136. As a result of Defendants' tortious interference with Plaintiff's contractual relations with Jacob Fincher and/or Jacob Fincher State Farm, Plaintiff has been damaged by the Defendants in an amount to be determined at trial.

137. By the reason of the foregoing, Plaintiff requires injunctive relief. Unless injunctive relief is granted, Plaintiff will be irreparably harmed in a manner not fully compensable by money damages.

## COUNT V: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (FOR DAMAGES AND INJUNCTIVE RELIEF)

138. Plaintiff restates and realleges paragraphs one (1) through one-hundred-sixteen (116), *supra*.

139. Defendants' activities as set forth above constitute tortious interference with the business relations between Plaintiff and Jacob Fincher and/or Jacob Fincher State Farm improperly and without privilege.

140. Defendants induced Jacob Fincher and/or Jacob Fincher State Farm to terminate Plaintiff's business relationship with Jacob Fincher and/or Jacob Fincher State Farm improperly and without privilege by making false statements regarding Plaintiff's work history, amongst other allegations.

141.  Defendants' activities as set forth above constitute tortious interference with the business relations between Plaintiff and State Farm.

142.  Defendants induced State Farm to terminate Plaintiff's business relationship with State Farm improperly and without privilege by making false statements regarding Plaintiff's work history, amongst other allegations.

143.  As a result of Defendants' interference with Plaintiff's business relations with Jacob Fincher / Jacob Fincher State Farm and State Farm, Plaintiff  has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

144.  By reason of the foregoing, Plaintiff requires injunctive relief. Unless injunctive relief is granted, Plaintiff will be irreparably harmed in a manner not fully compensable by money damages. In addition, Plaintiff has been damaged in an amount to be determined at trial.

145.  By the reason of the foregoing, Plaintiff requires injunctive relief. Unless injunctive relief is granted, Plaintiff will be irreparably harmed in a manner not fully compensable by money damages.

## COUNT III: FRAUD (BRIAN JARRETT)
## (FOR DAMAGES AND INJUNCTIVE RELIEF)

146. Plaintiff restates and realleges paragraphs one (1) through one-hundred-sixteen (116), *supra*.

147. Defendant Brian Jarrett made intentionally false statements as to both Plaintiff's allegedly bad faith writing of insurance policies, the role Plaintiff played in writing certain insurance policies, and/or made edits to documents submitted to State Farm and/or other parties which knowingly provided false statements to State Farm and other entities for the benefit of Defendant Jarrett and to the detriment of Plaintiff.

148. Plaintiff had no choice but to act upon these intentionally false statements.

149. Defendant Brian Jarrett's false reporting of Plaintiff's alleged bad faith actions and other material misrepresentations are a materially false set of facts.

150. As a result of Defendant Brian Jarret's false statements regarding Plaintiff's alleged bad faith as well as Defendant Brian Jarrett's own role in certain insurance policies, Defendant Brian Jarrett has damaged and will continue to damage the Plaintiff.

151. By the reason of the foregoing, Plaintiff requires injunctive relief. Unless injunctive relief is granted, Plaintiff will be irreparably harmed in a manner not fully compensable by money damages.

## COUNT VII: PUNITIVE DAMAGES UNDER GEORGIA LAW

152. Plaintiff restates and realleges paragraphs one (1) through one-hundred-sixteen (116), *supra*.

153. The aggravating circumstances in Defendants' commission of the conduct against Plaintiff and intentions in committing same, entitle Plaintiffs to an award of punitive damages to deter Defendants from repeating the same tortious interference and as compensation for the tortious interference.

## COUNT VIII: CLAIM FOR ATTORNEYS FEES UNDER GEORGIA LAW

154. Plaintiff restates and realleges paragraphs one (1) through one-hundred-sixteen (116), *supra*.

155. Defendants have acted in bad faith in these transactions, and Defendants have been stubbornly litigious and caused Plaintiff unnecessary trouble and expense, entitling Plaintiff to recover his attorneys' fees and expenses of litigation pursuant to O.C.G.A. §13-6-11.

## JURY TRIAL

156. Plaintiff demands a jury trial as to all issues triable by a jury trial.

## **PRAYER FOR RELIEF**

157.   **WHEREFORE**, Plaintiffs respectfully requests that this Court:

A. Grant Plaintiff a trial by jury as to all triable issues of fact;

B. Find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm is covered by, and subject to, the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq*.;

C. Find that Defendant Brian Jarrett acted directly in the interest of Defendant Brian Jarrett d/b/a Brian Jarrett State Farm relation to the Plaintiff, and that as such, Defendant Brian Jarrett was an "employer" of Plaintiff within the meaning of §3(d) of the Act, 29 U.S.C. §203(d);

D. Find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm, and Defendant Brian Jarrett, collectively, have violated the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq*., by failing to properly pay the Plaintiff his overtime wages as required;

E. Find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm, and Defendant Brian Jarrett, collectively, acted "willfully" thus entitling the Plaintiff to recover his damages under the Act for the period of three (3) years from the date of this Complaint;

F. Find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm, and Defendant Brian Jarrett, collectively, be ordered to pay Plaintiff's overtime wages, at a rate equal to one and one-half his "regular rate" of pay, for all

workweeks in which Plaintiff worked more than forty (40) hours in the Employment Period;

G. Find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm, and Defendant Brian Jarrett, collectively, be ordered to pay Plaintiff liquidated damages under the Act;

H. Find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm and Defendant Brian Jarrett, collectively, be ordered to pay Plaintiff's reasonable attorneys' fees, and costs of this action pursuant to 29 U.S.C. §216;

I. Find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm, and Defendant Brian Jarrett violated their contractual agreements and award an amount to be determined at trial;

J. In the alternative to breach of contract, find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm and Defendant Brian Jarrett were unjustly enriched by Plaintiff's services and/or work and award an amount to be determined at trial;

K. Find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm and Defendant Brian Jarrett tortiously interfered with Plaintiff's contractual relationship with Jacob Fincher and/or Jacob Fincher State Farm and award an amount to be determined at trial;

L. Find that Defendant Brian Jarrett d/b/a Brian Jarrett State Farm and Defendant Brian Jarrett tortiously interfered with Plaintiff's business relationship with State Farm and award an amount to be determined at trial;

M. Find that Defendant Brian Jarrett committed fraud and that Defendant Brian Jarrett be ordered to pay Plaintiff the appropriate damages for fraud in an amount to be proven at trial;

N.  Award Plaintiff punitive damages, pre-judgment, and post-judgment interest in an amount to be determined at trial;

O. Grant Plaintiff an injunction requiring Defendants to inform State Farm, Jacob Fincher, and/or Jacob Fincher State Farm, and/or any additional entities in which Defendants contacted regarding Plaintiff's work, that Plaintiff did **not** act inappropriately, illegally, and/or in bad faith when Plaintiff wrote insurance policies on behalf of Defendants for State Farm;

P. Award the Plaintiff his reasonable attorney's fees and expenses of litigation on Plaintiff's state law claims pursuant to O.C.G.A. § 13-6-11; and,

Q. For such other and further relief as the Court finds just and appropriate.

Respectfully submitted this 15th day of June, 2023.

 */s/ Peter H. Steckel*
Peter H. Steckel
Georgia Bar Number 491935
Counsel for Plaintiff

**Steckel Law, L.L.C.**
1120 Ivywood Drive
Athens, Georgia 30606
Tele: (404) 717-6220
Email: peter@SteckelWorkLaw.com